UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
SOUTHERN DIVISION at LONDON

CIVIL ACTION NO. 06-307-GWU

MARY E. SIZEMORE,                                                    PLAINTIFF,

VS.                          **MEMORANDUM OPINION**

MICHAEL J. ASTRUE,
COMMISSIONER OF SOCIAL SECURITY,                      DEFENDANT.

* * * * * * * *

The plaintiff, Mary E. Sizemore, has filed an appeal of an administrative decision to terminate Supplemental Security Income (SSI) benefits originally awarded in 1996.  After a previous remand by this court, Sizemore v. Barnhart, London Civil Action No. 03-49 (E.D. Ky. February 12, 2004) (Tr. 351-7), the case was consolidated with a new SSI application filed February 18, 2003 (Tr. 512-15), and is once again before the undersigned on cross-motions for summary judgment.

## STANDARDS APPLICABLE TO TERMINATION DECISIONS

When the issue is the termination of benefits, the regulations establish the following eight-step test:

1.     Is the beneficiary engaging in substantial gainful activity?  If so, then the disability will be found to have ended.  See 20 C.F.R. Section 404.1594(f)(1).

2.     Provided the beneficiary is not engaged in substantial gainful activity, does the beneficiary have an impairment or combination of impairments which meet or equal the severity

1

06-307 Sizemore

of impairments in the Listing?  If so, then the disability must be found to continue.  See 20 C.F.R. Section 404.1594(f)(2).

3.    If the beneficiary does not equal a listing, then the question is whether there has been medical improvement (any decrease in the medical severity of one's impairments, as per 20 C.F.R. 404.1594(b)(1)).

4.    Provided medical improvement has occurred, then the question is whether this has produced an increase in the residual functional capacity.  If the improvement is not related to the ability to perform work activities, then one proceeds to step 5.  If the improvement is related work ability, then one proceeds to step 6.  See 20 C.F.R. Section 404.1594(f)(4).

5.    Provided there has been no medical improvement or the improvement is not related to work ability, then one must decide whether an exception to the medical improvement standard will apply.  If not, then a finding of continuing disability should be made.  See 20 C.F.R. Section 404.1594(f)(5).

6.    If the medical improvement is found to be related to work ability or if an exception to the medical improvement standard applies, then one considers whether the current impairments in combination are severe.  If so, then one proceeds to step 7; if not, the beneficiary is no longer considered disabled. See 20 C.F.R. Section 404.1594(f)(6).

7.    If the impairments are found to be severe, then one must assess the beneficiary's ability to engage in substantial gainful activity in accordance with 20 C.F.R. Sec. 404.1561.  If found capable of performing past relevant work, then the disability will be found to have ended.  Otherwise, one proceeds to step 8.  See 20 C.F.R. Section 404.1594(f) (7).

8.    Provided the beneficiary cannot perform past relevant work, then one must assess the residual functional capacity and considering the age, education, and past work experience, determine whether other work can be performed.  If so, then the beneficiary is no longer disabled.  Otherwise, a finding of continuing disability should be made.  See 20 C.F.R. Section 404.1594(f)(8).

2

06-307 Sizemore

The standard for judicial review is whether there is substantial evidence to support the Secretary's decision that the plaintiff's condition has improved to the extent that he can perform substantial gainful activity.  Casiano, Jr. v. Heckler, 746 F. 2d 1144 (6th Cir. 1984).  The Court must determine from the record upon what conditions the claimant was awarded benefits, and whether there has been any improvement in these conditions.  Id. at 1148.

**DISCUSSION**

As the court noted at the time of its 2004 memorandum opinion, the issue in a termination case is whether there was substantial evidence to support the agency's decision that Mrs. Sizemore's condition had "medically improved" since she had been awarded benefits.  (Tr. 353).  The transcript then before the court did not contain sufficient medical records to show the plaintiff's condition at the time she was found to be disabled on July 22, 1995, and it could not be determined whether the impairments which existed at the time of favorable decision, namely posterior dislocation of the left elbow and a right temporal lobe arteriovenous malformation associated with left-sided weakness and numbness (Tr. 322), were improved as of August 1, 2000, the date the plaintiff was notified that her disability would cease (Tr. 60-2, 354).

On remand, additional medical exhibits were included in the transcript, showing that the plaintiff had dislocated her left elbow in a fall on July 22, 1995.  (Tr. 421).  The elbow was reduced in the emergency room, and an x-ray showed normal

3

articulation.  (Tr. 425).  The plaintiff sought treatment for several months from an orthopedist, Dr. James T. Coy, who found her neurovascular status to be intact, but swelling and ecchymosis were present in the left elbow area.  (Tr. 434).  X-rays showed no evidence of any fracture, and all articular surfaces were concentric and congruent.  (Id.).  Dr. Coy provided a splint and recommended gentle range of motion exercises and physical therapy.  As of the plaintiff's last visit to this source in October, 1995, she still lacked 45 degrees of full extension, but could flex to 110 degrees and had improving pronation and supination.  (Tr. 431). Dr. Coy stated that she would have a permanent impairment.  (Id.).

Mrs. Sizemore then sought treatment from another orthopedist, Dr. Paul Forberg, in early 1996.  Dr. Forberg found a range of motion from 45 to 100 degrees "with pain," and a weak grip, but full pronation and supination.  (Tr. 462).  An x-ray showed only a small osseous abnormality of uncertain clinical significance.  (Tr. 465).  After numerous canceled medical appointments, the plaintiff stopped going to physical therapy and asked Dr. Forberg for pain medications, but he provided only nonsteroidal anti-inflammatory drugs.  (Tr. 461).  He did not see the plaintiff after May 10, 1996.  He did provide a functional capacity assessment dated July 20, 2002, which limited Mrs. Sizemore to less than full-time sitting, standing, and walking, lifting no more than 10 pounds occasionally, and having severe restrictions on reaching, bending, twisting, maintaining attention and concentration, and dealing

4

06-307 Sizemore

with work stress.  (Tr. 609-14).[1]

At a consultative examination by Dr. Mark Carter in March, 2000, the plaintiff allowed only a very limited examination of her left upper extremity, crying and complaining of pain.  (Tr. 149).  Supination and pronation of the wrist was full, and grip was rated four out of five bilaterally "with breakaway."  (Id.). Dr. Carter noted that there did not appear to be any asymmetric development.  (Id.). A state agency physician, Dr. Timothy Gregg, examined the evidence at this point and concluded that the plaintiff would have the capacity to perform work at all exertional levels with no climbing of ladders, ropes, or scaffolds or exposure to hazards such as machinery and heights.  (Tr. 237-44).  Regarding the plaintiff's left elbow problem, he interpreted her behavior during Dr. Carter's examination as being exaggerated and inconsistent, "exhibiting give way weakness and behavior consistent with marked exaggeration and magnification of limitations."  (Tr. 245).  He thought that it was "of particular interest that no muscle atrophy was present."  (Id.).

One of the plaintiff's treating family physicians at the time, Dr. David Hays, found only "mild tenderness" of the left elbow on a June 7, 2000 examination.  (Tr. 229).  There was no edema or crepitus.  On subsequent office visits over the next few months, little was said about left elbow problems, although it was noted on two occasions that the plaintiff complained of pain in both elbows and would not let the

---

[1]The ALJ questioned Dr. Forberg's restrictions because he treated her for only a brief period of time six years earlier. (Tr. 326).

5

physicians fully examine her.  (Tr. 226-8). X-rays of the left elbow, forearm, and wrist obtained May 31, 2000 were all reported normal.  (Tr. 677).  Dr. Walter Downey, one of the physicians, noted on July 31, 2000 that the plaintiff "was asking about disability for Social Security today," but stated that he would need to do more tests and further evaluation of her function before making her "100 percent disabled."  (Tr. 227).  He added, however, that, while he did not think that Mrs. Sizemore could "do an active job" due to her diffuse pain, arthritis, and back pain, he would have to evaluate her further before he could determine that she "could not do a desk job or something with a little more activity."  (Id.).  On subsequent visits to Dr. Downey in 2001, the plaintiff complained primarily of right arm pain.  (Tr. 260-1).

However, Dr. Pinkesh Patel, an orthopedist, began treating Mrs. Sizemore on April 13, 2002 for complaints of neck, mid, and low back pain, as well as arm and knee pain, and his findings included point tenderness, pain, and mild edema throughout the neck, back, and left elbow areas.  (Tr. 608).  Left arm strength was rated as only 3/5.  (Id.).  He diagnosed lumbalgia, cervicalgia, and elbow pain, and recommended that she be "taken off of work" and restricted to lifting no more than 10 pounds, standing no more than two hours at a time, sitting no more than three hours at a time, with no bending, stooping, kneeling, or "overhead reaching."  (Id.).  On a subsequent visit, on April 25, 2002, Dr. Patel noted that the plaintiff could not straighten out her left elbow.  (Tr. 606).  Although the handwritten office notes are

6

not entirely legible, it does not appear any improvement in her left arm function was recorded over the next three months.  (Tr. 597-605).

At the October 6, 2004 administrative hearing, Mrs. Sizemore testified that she was wearing her left arm in a sling because of a recent operation to replace her pacemaker, and she had been told to wear the sling whenever she went out, not to lift, not to raise the arm over her head, and not to put it behind her back.  (Tr. 893-5).  Prior to the recent pacemaker replacement operation, she stated that the left elbow still hurt, and, although it was not as bad as nine years ago, she still could not straighten her arm entirely.  (Tr. 898).  Counsel for the plaintiff estimated at the hearing that she was demonstrating extension a little beyond 90 degrees; the ALJ did not vocalize disagreement.  (Id.).  She was able to move her fingers, but said they hurt, and testified her little finger remained numb.  (Tr. 899).  The plaintiff stated that she was sometimes unable to put her shirt on (Tr. 903), could do no chores (Tr. 904-5) and was unable to lift with the left arm (Tr. 908,912).

A Medical Expert (ME), Dr. Milton Freedman, a specialist in internal medicine, testified at the October 6, 2004 administrative hearing regarding all the plaintiff's impairments.  Regarding her left elbow problem, Dr. Freedman based much of his testimony on a review of the reports of various state agency physicians who had not examined the plaintiff, including Dr. Gregg (Tr. 924) and 2003 reviewers J. E. Baez-Garcia and another source whose signature is illegible (Tr. 812-17, 853-6).  None of the sources indicated that they had reviewed any treating

06-307 Sizemore

source statements. (E.g. Tr. 817, 856).  As far as examining sources were concerned, Dr. Freedman testified only regarding Dr. Carter's March 22, 2000 assessment, and stated that, following this "limited examination due to complaints of severe pain," he had not seen the issue of medical improvement addressed in the medical evidence of record.  (Tr. 922-3).  He felt that there would be some evidence of atrophy if she had not been able to use the left arm at all.  (Tr. 923). He was not sure what Dr. Carter meant about "breakaway" on testing.  (Tr. 925). He concluded that he would not impose any functional limitations on the use of the left upper extremity from the medical evidence, but added that "there is a question of adequate examination."  (Tr. 925-6).

It is clear that much of the evidence regarding the plaintiff's left elbow complaints was not reviewed by the ME, and state agency reviewers who found the limitations on the use of the left arm apparently took no notice of the reaching limitations imposed by Drs. Forberg and Patel, who had both treated the plaintiff and specifically found limitations in the range of motion of the left arm.  In addition, treating source Downey's questioning of whether the plaintiff would be able to do a "desk job" and treating source Coy's opinion that the left elbow would have a "permanent impairment" were not taken into account.  Thus, substantial evidence does not support the administrative conclusion of medical improvement of the condition, or the ALJ's determination that from August 1, 2000 through the date of

06-307 Sizemore

the decision, the plaintiff did not have any reaching limitations. (Tr. 334).[2]

Regarding the right temporal lobe arteriovenous malformation, the other impairment which had been found to be present at the time Mrs. Sizemore was found to be disabled, Dr. Gregg commented in 2000 that it was subsequently determined that the plaintiff's syncopal episodes were due to cardiac arrhythmia, which was corrected with the implantation of a pacemaker.  (Tr. 245).  Dr. Freedman, the ME, also testified that arteriovenous malformation was a different condition from "sick sinus syndrome" and pacemaker implantation. (Tr. 926).[3] Indeed, the plaintiff denied having syncopal episodes at the time of Dr. Carter's March 22, 2000 evaluation.  (Tr. 147).  Extensive medical records related to the plaintiff's cardiac condition were supplied, and the plaintiff's cardiologists, Dr. Anis Chaloub and Sandesh Patil, conducted numerous objective tests of her cardiac condition, which included an inconclusive stress test in November, 2000 (Tr. 174), normal EKGs in May, 2001 and June, 2002 (Tr. 256, 617),  echocardiograms in 2001, 2002, 2003 and 2004 which showed moderate atrial insufficiency at most (Tr. 258, 470, 623, 808, 861), and normal catheterizations in 2000, 2002, and 2003 (Tr. 151-2, 647-8, 722-3).   In November 2001, Dr. Chaloub noted complaints of

---

[2]Even if the plaintiff was exaggerating her symptoms, it is still not clear that she had no limitations on the use of her left arm.

[3]Dr. Freedman testified that an arteriovenous malformation was a lesion in the brain, but a sick sinus syndrome arises in the upper part of the heart. (Tr. 926). An EEG did not show any abnormality of the brain, and there was no other information regarding the arteriovenous malformation. (Tr. 926-7).

9

06-307 Sizemore

palpitations without any syncopal episodes, and changed medications, but a Holter monitor showed normal sinus rhythm, rare premature atrial contractions, and no arrythmia. (Tr. 620, 630). Although the plaintiff complained of continued palpitations on the new medication, an EKG was normal. (Tr. 617).

Dr. Patil completed a functional capacity assessment on March 22, 2004, stating that he had treated the plaintiff since April 23, 2002 and her diagnoses were sick sinus syndrome status post pacemaker placement, aortic insufficiency, hypertension, a hiatal hernia, anemia, and palpitations. (Tr. 779). Despite the pacemaker, he stated that the plaintiff still had palpitations, shortness of breath, dizziness, and weakness. He felt that she was capable of lifting 10 pounds occasionally, less than full-time sitting, standing, and walking, would need to have her legs elevated 50 percent of the time, and would also have restrictions on reaching, stooping, and crouching. (Tr. 781-2).

The ME testified that from his review of the evidence, Dr. Patil's restrictions were exaggerated. (Tr. 929).[4]   He thought that there was evidence of medical improvement in the plaintiff's syncopal episodes following the pacemaker implantation, and the only work restrictions which would be required would be those related to being on the pacemaker, such as not being around certain types of equipment. (Tr. 928).

---

[4]He saw no medical reason for keeping the plaintiff's legs elevated, and testified that the echocardiogram of April 1, 2004 was essentially normal. (Tr. 928-30). The latest medical evidence of record said nothing about swelling of the legs. (Tr. 932).

10

06-307 Sizemore

In this case, there was a lack of objective medical evidence to support Dr. Patil's opinion, and the ME adequately addressed the issue of improvement. Therefore, the ALJ had substantial evidence to support a conclusion that medical improvement had occurred with regard to the arteriovenous malformation.

In view of the fact that a remand will be required for further consideration of the issue of medical improvement, the court will not reach the issue of whether substantial evidence supports the ALJ's conclusion that Mrs. Sizemore's condition following her 2003 application was not disabling.

The decision will be remanded for further consideration.

This the 6th day of June, 2007.

**Signed By:**

_**G. Wix Unthank**_

**United States Senior Judge**

11